UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED

03 DEC 30 PM 3:38

JENNIFER VIGIL,

Plaintiff,

NO. 02-CV-1241 JB/WDS

v.

GOVERNING BOARD OF THE
ALBUQUERQUE TECHNICAL
VOCATIONAL INSTITUTE

Defendant.

PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Plaintiff by and through counsel, Bill Gordon and Associates, (Thomas J. Griego)

hereby submits the following proposed Findings of Fact and Conclusions of Law:

FINDINGS OF FACT:

1.  Jennifer Vigil (Vigil) is a resident of Albuquerque, Bernalillo County, New Mexico.

2.  Albuquerque Technical Vocational Institute, (hereinafter "TVI") is a state institution
    of higher education having its principal place of business in the State of New Mexico
    and the City of Albuquerque and TVI Governing Board is a corporate body subject to
    suit.

3.  TVI has at least fifteen employees as defined by Title VII of the Civil Rights Act. (42
    U.S.C. §2000(e) et seq. as amended.

4.  The unlawful employment practices and other acts which give rise to the Complaint
    were committed in Albuquerque, New Mexico and are within the jurisdiction and
    venue of this Court.



5. Plaintiff files the above-captioned action under Section 16(c) of the Fair Labor Standards Act, 29 USC §§216(c) and 217 and §706(f)(1), and § 706(f)(1) and (3) of Title VII, alleging that the Defendants discriminated against Plaintiff, in the setting of her wages, terms, conditions and privileges of her employment on the basis of her gender (female).

6. Vigil began working for TVI in January of 1998 as a Security Aide under a work/study program and became a full time Security Officer I for TVI in 1999. She and is currently employed by TVI as a Security Officer III; a supervisory position.

7. At the time of she was hired by TVI, and at the time she applied for promotions. Vigil was led to believe that she would be compensated based on merit and qualifications without reference to gender preference. TVI also adopted a policy and procedure by which Vigil was led to believe that she would be compensated based on merit and qualifications without reference to gender preference and stated so on all its job postings and applications upon which Vigil relied.

8. In August or September 2000, Vigil, who was then employed as a Security Officer I applied for a promotion to an open, vacant position as Security Officer III.   The promotion was given to a male co-worker, Joe Candelaria, a probationary employee with less seniority and fewer qualifications than Vigil.

9. The starting pay given to Joe Candelaria upon promotion to Security Officer III was $11.79 per hour.

10. Candelaria's wage of $11.79 was above the beginning point on the wage scale for the Security Officer III position.

2

11. TVI determined Candelaria's wage upon promotion by giving him credit for his prior military experience and calculated the amount of that credit by applying the formula set forth in TVI policy 5.02(B).

12. In July of 2001 another promotional opportunity to Security Officer III was posted and Vigil applied for the position.

13. She was given that promotion effective July 17, 2001. However, her pay after promotion was at the bottom of the pay scale, $11.13, compared to her male counterpart, Joe Candelaria whose starting pay was $11.79 per hour for the same work.

14. The method used to determine Vigil's wage upon promotion was that found in TVI's Section V Wage and Salary Policies, Rule 5.02(C)(2), and because the beginning level of the Security Officer III wage scale represented an increase of at least 5%, over her base wage her wage upon promotion was set at the beginning level, $11.13 per hour.

15. Following Plaintiff's promotion, another male, John Crawford, was promoted to Security Officer III on or about September 2001.

16. TVI set Crawford's wage above the beginning point on the wage scale for Security Officer III, at $13.02 per hour.

17. TVI determined Candelaria's wage upon promotion by giving him credit for his prior experience and calculated the amount of that credit by applying the formula set forth in TVI policy 5.02(B).

18. The manner and method used by the Defendant to determine Crawford's and Candelaria's wage upon promotion was different than that used to determine Vigil's

3

wage. Specifically, upon promotion, Candelaria's and Crawford's wages were set by
application of Rule 5.02(B) whereas Vigil's was set by application of TVI policy
5.02(B) we with the result that the two males upon promotion received a more
generous pay raise than the female Plaintiff.

19. Vigil filed a charge with the Equal Employment Opportunity Commission on March
    28, 2002 alleging in part that TVI discriminated against her setting wages.

20. About the same time that Vigil received her right to sue letter from the EEOC on June
    20, 2002, TVI recalculated Plaintiff's wage and made an adjustment to that wage,
    retroactive to her promotion, increasing her hourly wage to $11.69.

21. TVI calculated the adjustment to Vigil's wage by applying TVI policy 5.02(B) giving
    her credit for her EMT training and for her Associate of Arts degree.

22. Although the adjustment to her wage purported to follow the provisions of Section
    5.02(B), the method of calculation used by TVI continued to favor the male Security
    Officers III and disfavor the Plaintiff in that Vigil was only given credit for the
    number of credit hours necessary to obtain her Associate of Arts degree and did not
    count credit hours beyond that, whereas in counting Crawford's credit hours, who did
    not hold any type of degree, all credit hours were counted.

23. Although Vigil called to TVI's attention that the wage adjustment was not properly
    calculated TVI refused to make any further adjustments.

24. TVI has adopted policies and procedures embodied in an employee handbook. The
    version of those policies applicable to this case is that updated March 2002.

25. Among the policies and procedures applicable to this case are the following:

    a. "INTRODUCTION. The employee Handbook contains policies that govern all
       employees at the Albuquerque Technical Vocational Institute (TVI)..."

4

b. "EQUAL OPPORTUNITY STATEMENT. The Institute affirms that it will not illegally discriminate on the basis of gender, race, color, national origin, religion, age, disability, sexual orientation or marital status in any of its policies, practices or procedures in accordance with applicable federal state and local laws, nor will it condone any act of illegal discrimination or harassment on the part of its employees. This provision includes but is not limited to, employment, admissions, testing, financial aid and educational services..."

c. "SECTION I: MISSION/VISION/VALUES/GOAL. ...TVI will: Provide accountability through an ongoing system of evaluation, analysis and adjustment."

d. "SECTION III: EMPLOYMENT POLICIES. 3.02 EMPLOYEE GROUPS.
   A. Non-Exempt: an employee who is covered by the Fair Labor Standards Act for overtime purposes. Non-exempt personnel; include but are not limited to , support personnel classified in such categories as clerks and secretaries, food service workers, maintenance and custodial workers security personnel, data services and computer operations employees. instructional and non-instructional technicians..."

e. "SECTION V: WAGE AND SALARY POLICIES. 5.01. DEFINITION.
   The wage and salary administration guidelines in this section apply to employees below the dean level, with the exception of faculty and some professionals designated by the president.
   5.02 STAFF
   Initial pay rates for regular full- and part-time staff employees are established at the time of hire. The initial pay rate is determined jointly by the employee's dean/director or department head and the appropriate vice president, with final approval by the president or the president's designee.
      A. Pay levels. Full time and part-time staff employees are assigned to an employee classification upon employment. Each classification carries a minimum annual salary level for exempt employees and a minimum hourly rate for non-exempt full- and part-time employees.
      (1) No employee will be paid at a rate less than the minimum for the applicable position classification.
      (2) Minimum rates are listed in the Master Salary Schedule and may be updated periodically during the fiscal year.
      (3) Any full or part time position, which is not a replacement, shall be measured by Human Resources for appropriate placement on the salary schedule.
      (4) Part-time positions that are authorized additional hours need not be re-evaluated if the only change in position is time on task.
      B. Establishing the rate of Pay for New Employees. Qualifications and experience of the employee as well as budgetary and internal equity considerations will be used in determining the entry rate of pay.
      (1) The initial rate of pay ordinarily will be the minimum pay of the classification.
      (2) The hiring rate for regular full- and part-time employees may be

5

between the minimum pay and 125 percent of the minimum pay for the appropriate classification.

(a) Credit for experience may be given at the rate of 2 percent of the minimum pay for each year of directly comparable prior experience beyond that required for the position up to a maximum of 125 percent of the minimum.

(b) Compensation may be given based on current market value if agreed upon and approved by the hiring dean/director or department head, the human resources director, the appropriate vice president and the president. Written documentation to support this compensation must be provided specifically addressing difficulty in recruitment, high turnover and/or comparable market pay rates.

(c) A combination of (a) and (b) above shall not exceed 125 percent of the minimum pay for the appropriate classification.

(3) Temporary and casual employees will be hired at the minimum pay of the appropriate classification or such higher pay as approved by the president.

(4) Returning employees are considered new employees.

C.  Actions Which May Change an Employee's Rate of Pay.

(1) Annual pay plan adjustment. Each year the Governing Board approves a pay plan which may include increases or decreases to the minimum and/or maximum pay of classifications and/or increases or decreases to salaries.

(2) Promotion. A promotion occurs when an employee moves to a new classification with a higher grade level through the application process. The employee's new rate of pay must be at least the minimum pay assigned the new classification or calculated as follows, whichever is greater:

(a) For a promotion, the employee's current rate of pay will increase by at least 5 percent, except that the increase may not raise the employee's rate of pay above the maximum pay of the new classification. If the employee's current rate of pay exceeds 125 percent of the minimum pay of the new classification, the employee's current rate of ay will not increase by more than 5 percent. but in no event will it exceed the maximum pay of the new classification... "

26. TVI has promulgated an Administrative Directive regarding Section 5.02 of the

Employee handbook which Directive states in part:

"TVI's pay structure is a system of standard pay grades that provides an equitable and consistent basis for paying non-instructional employees, except for student employees and those covered by Administrative Employment Contracts. Each grade is assigned a pay range with a specified minimum amount, a midpoint, and a maximum amount as

shown on a Master Salary Schedule. The pay structure is a logical and ordered framework that includes the internal job relationships developed through the position evaluation process."

27. Vigil applied for promotion to Security Officer III in March of 1999, by completing an application form supplied to her by TVI which application form contains the following phrase:

   "Albuquerque TVI does not discriminate on the basis of gender, race, color, national origin, religion, age, disability, sexual orientation, marital status or ancestry in any of its policies, practices, procedures and employment."

28. In June of 2001 TVI posited a vacancy announcement for two Security Officer III positions which Vigil read.

29. Vigil met the minimum qualifications for the Security Officer III positions posted in June 2001.

30. The two positions for Security Officer III were posted by TVI on a form approved by Susan Crawford, employed by TVI's Human Resources department, entitled "Job Announcement".

31. All Job Announcements promulgated by TVI and relied upon by Vigil, whether for Security Officer I or Security Officer III positions for which she applied contained a statement that "TVI IS AN EQUAL OPPORTUNITY EMPLOYER".

32. At the time Vigil applied for promotion to Security Officer III in June of 2001, she had completed 139 post secondary credit hours and held an Associate of Arts degree.

33. On or about July 18, 2000, Vigil completed the training necessary for certification as an Emergency Medical Technician.

34. On or about March 7, 2002 Vigil asked Dave Casalino, then Interim Director of
    Security to look into why her wage upon promotion was set at the minimum on the
    scale while that of John Crawford was set above the minimum.

35. In March 2002, Dave Casalino, requested Susan Crawford to compare the pay rates of
    three individuals recently promoted to Security Officer III.

36. Susan Crawford responded to Mr. Casalino's request in a memorandum dated March
    20, 2002.

37. Although her memorandum purported to compare wage rates for three recently
    promoted individuals, wage rates for only two employees, Vigil and John Crawford
    are referenced in the memorandum.

38. Immediately prior to her promotion to Security Officer III, Vigil's base hourly wage
    was $9.89 per hour and her wage upon promotion was based on that wage.

39. Immediately prior to his promotion John Crawford's base hourly wage was $10.72
    per hour and his wage upon promotion was based on that wage.

40. According to Crawford's March 20, 2002 Memorandum the reason John Crawford
    received a greater increase upon his promotion than did Vigil, is that (1) his rate prior
    to promotion was higher that Vigil's (2) he was given additional credit for experience
    and education.

41. In order to establish the wage upon promotion for John Crawford, TVI applied the
    provisions of Section 5.02(B)(2)(a), giving him an additional 2 percent of the
    minimum pay for Security Officer III for each year of comparable prior experience
    and included in its computation of comparable prior experience, college credits
    earned by him.

42. At the time of his promotion to Security Officer III John Crawford had 39 credit hours of post-secondary education.

43. TVI considered 39 credit hours to be the equivalent of 1 1/3 years of education.

44. In May of 2002, TVI adjusted Vigil's hourly wage to credit her for experience and education as it had done for john Crawford.

45. At the time of her wage adjustment in May of 2002, Vigil held an Associate of Arts Degree but also had credit hours beyond the minimum necessary to earn the degree for a total of 130 credit hours.

46. In adjusting her wage to comport with the method used to calculate John Crawford's wage. TVI credited her with 2 years of "educational experience" based on her A>A> degree, but did not count her total post-secondary credits as it had for her male counterpart, John Crawford.

47. At the time John Crawford's wage was set by TVI at the time of his promotion. he was given year's education credit for his EMT training. At the time of her wage adjustment in May of 2002, Vigil who also holds certification as an EMT was also given one year's education credit for her EMT certification. Thus her total education was considered to be three years.

48. The wage rate set for John Crawford was reviewed and approved by Sadie Tafoya, Vice President of Administrative Services for TVI.

49. TVI did not apply the provisions of Section 5.02(B)(2)(a) to its calculation of Vigil's was at the time she was promoted to Security Officer III.

50. The reasons for the wage differences set forth in Susan Crawford's memo were explained to Vigil by Susan Crawford herself and by Dave Casalino.

51. Vigil has incurred attorney's fees and cost in connection with prosecuting this case to which she is entitled as a prevailing party under the Equal Pay Act, Title VII and the New Mexico Human Rights Act.

52. On June 18, 2002, Vigil received her Right to Sue letter from the EEOC and filed the instant action within 90 days thereafter.

53. As of the date of her promotion to Security Officer III July 17, 2001, TVI considered her to have been working for TVI 2 ½ years and thus given 2.5 years of experience credit, even though she began her career at TVI in 1998 as a Security Aide under a work/study program before becoming a full time Security Officer I for TVI in 1999. The reason that her total experience was reduced to 2 ½ years is because TVI gave her 4 months of employment credit for the eight months she worked in the work/study program because during that time she worked what TVI considered to be "essentially half time" and "rounded" downward, 2 years and 7 months to 2 ½ years.

54. While employed in the work/study program Vigil usually worked a shift that ran from 5:00 p.m. to 10:00 p.m. for a total of 5 hours a day, 4 days per week. However, during semester breaks and Holidays, Vigil began her shift earlier and sometimes worked more than 4 days per week so that at least one month out of the eight she worked under the work/study program, she worked approximately 40 hours per week.

55. The hourly rate of pay for Joseph Candelaria, a male, at the time of his promotion to Security Officer III was $11.79 per hour.

56. During the time she worked as a Security Officer for TVI Vigil experienced events demonstrating a bias against women in general and her in particular because of her gender. For example, after her initial hire she was as scheduled to work more hours

than her male counterparts. She was present when her male counterparts and her

supervisors including Jean Clark made sexually suggestive comments about other

women in the workplace indicating that they did not view women as their equals.

Vigil directed complaints about such comments directly to the persons involved.

After Vigil filed her charge of discrimination with the EEOC differences in the

scheduling ceased and sexually suggestive comments in her presence declined.

57. Prior to June 17, 2001 Vigil's base rate of pay was $9.89 per hour plus $0.84 per hour

for a combined hourly wage rate of $10.73 per hour.

58. After her promotion on June 17, 2001, Vigil's rate of pay was increased to $11.13 per

hour. However, had TVI applied the same education and experience factors as it

applied to John Crawford and Joe Candelaria, in calculating her wage after

promotion, her wage would have been increased to $12.34 per hour.

59. On or about June 30, 2001, Vigil received a 3% pay increase increasing her wage to

$11.46 per hour.

60. If TVI had applied increase the same education and experience factors as it applied to

John Crawford and Joe Candelaria, at the time of her promotion in June of 2001, her

3% wage increase would have resulted in an hourly wage of $12.71 instead of the

$11.46 she actually received.

61. In June of 2002, after Vigil filed an EEOC complaint alleging discrimination in

setting her wage, TVI adjusted her hourly wage rate to $11.69 per hour and paid her

back wages of $1,208.06 representing the difference in her prior wage of $11.13 per

hour and the her adjusted wage of $11.69.

62. In adjusting her wage to $11.69 TVI did not calculate her education and experience credits in the same manner as it did for her male counterpart, John Crawford.

63. After the wage adjustment to $11.69 per hour, a difference of $1.02 per hour still remained between her adjusted wage and the wage she should have been paid had the wage been properly calculated.

64. The work performed by Vigil, John Crawford and Joe Candelaria is substantially similar.

65. On June 30, 2002 Vigil received a 3% pay increase bringing her hourly wage rate up from $11.69 per hour to $12.04 per hour.

66. If TVI had applied increase the same education and experience factors as it applied to John Crawford and Joe Candelaria, at the time of her promotion in June of 2001, her 3% wage increase in 2002 would have resulted in an hourly wage of $13.09 instead of the $12.04 she actually received.

67. On June 30, 2003, Vigil received a 4% pay raise plus a $500.00 per year recurring bonus prorated to an hourly equivalent and made a part of her hourly rate. That increase brought her hourly rate to $12.64.

68. If TVI had applied increase the same education and experience factors as it applied to John Crawford and Joe Candelaria, at the time of her promotion in June of 2001, her 4% wage increase and recurring bonus in 2003 would have resulted in an hourly wage of $13.85 instead of the $12.64 she actually received.

69. The combined total of Vigil's back wage loss as of December 2003 is $6,674.71.

70. Despite demand, TVI has failed and refused and still fails and refuses to correct the calculation of Vigil's wage and to compensate for the difference in the wages paid.

CONCLUSIONS OF LAW:

A.  This Court has jurisdiction pursuant to and 42 U.S.C. §2000(e) *et seq.* and 29 U.S.C §
    216(b).

B.  Vigil has demonstrated that TVI has exhibited an illegal animus based on her gender
    with regard to setting wages to a degree sufficient to justify an award of damages.

C.  Vigil has demonstrated that she was treated differently from other male Security
    Officer III's in the terms and conditions of her employment, specifically in the setting
    of wages to a degree sufficient to justify an award of damages.

D.  Pursuant to 29 U.S.C § 216(b) Vigil is entitled to recover liquidated damages in an
    amount equal to the unpaid wages

E.  Vigil is entitled to an award of reasonable attorney's fees and costs incurred in this
    case.

F.  Vigil is entitled to additional damages for emotional distress.

G.  The policies and procedures promulgated by TVI with regard to wages and equal
    employment opportunity constitute an implied contract for employment, and Vigil
    justifiably and reasonably relied on their terms.

H.  By failing to calculate her wages in an equitable manner compared to John Crawford
    and/or Joe Candelaria, TVI breached the said contract for employment.

I.  TVI's breach of the contract for employment with Vigil was malicious, fraudulent,
    oppressive and/or committed recklessly with a wanton disregard for Vigil' rights,
    entitling her to an award of punitive damages.

J.  As a direct and proximate consequence of TVI' breach of contract, Vigil has suffered
    loss of wages and benefits, severe emotional distress and other incidental and

consequential damages. Such damages were reasonably foreseeable and calculable under the circumstances.

K. Vigil has demonstrated that TVI has paid her unequal wages for similar work performed by her male colleagues and TVI has not proved that reason for the unequal wage for any reason other than her sex.

Respectfully submitted,

Bill Gordon and Associates
By Thomas J. Griego, Esq.
2501 Yale Blvd SE Suite 204
Albuquerque, NM 87106

I certify that a true and
accurate copy of the foregoing
Requested Findings and Conclusions
was mailed to opposing counsel
This 30th day of December, 2003.

Thomas J. Griego, Esq.

14